UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 20-CR-268-CKK |
| FRANKLIN JOVANNY TORRES | : | |

## MEMORANDUM IN AID OF SENTENCING

Franklin Torres is not who she[1] was in 2019 when she sent a handwritten letter from the Bureau of Prisons to A.M. At the time, Ms. Torres had just finished a period of custody in solitary confinement, causing feelings of resentment and anger. In that moment of weakness and anger, Ms. Torres lashed out at the person she thought responsible for her situation. But Ms. Torres has since come to realize that her actions were misguided, and she deeply regrets her behavior. Based on the nature and circumstances of the offense, Ms. Torres's background and characteristics, her acceptance of responsibility, and the relevant law and sentencing factors under 18 U.S.C. § 3553(a), the defense respectfully requests a ten-month sentence to run concurrent to the remainder of Ms. Torres's sentence in case 15-CR-135, or in the alternative, a six-month term of imprisonment to run consecutive to her previously imposed sentence, which is fair and reasonable.

## BACKGROUND

The conduct in this case occurred in July 2019, while Ms. Torres was in the custody of the Bureau of Prisons. Around July 2, 2019, Ms. Torres sent a letter from the Bureau of Prisons to A.M., the mother of the complaining witness in a case for which Ms. Torres had been sentenced. The letter was received around July 6, 2019. The government was aware of this letter as early as

---

[1] The government and probation office use he/him pronouns when referring to Ms. Torres. Because she has begun transitioning and prefers she/her pronouns, this memorandum refers to the Ms. Torres using her preferred pronouns.

1

July 9, 2019, when FBI agents interviewed A.M. at her home about the letter. Yet Ms. Torres was not indicted until 17 months later, on December 1, 2020. This is despite the fact that as early as March 2020, the government had a verbal confession from Ms. Torres that she sent the letter to A.M. the prior summer, which the government obtained when agents visited Ms. Torres at FCI-Estill to execute a DNA search warrant.

Notwithstanding the evidence already had, the government waited nine months before indicting Ms. Torres. And then, for reasons the government has yet to explain, it waited nearly 4.5 *years* before even seeking a writ to pursue its, at that point, almost 6-year-old case against Ms. Torres. Nevertheless, Ms. Torres sought not to challenge the blatant violations of her Sixth Amendment right to a speedy trial. Instead, she has expressed clear and unequivocal remorse for her actions and has demonstrated growth and rehabilitation.

## SENTENCING LAW

The era of binding guidelines ended when the Supreme Court held that after severing the unconstitutional provisions of the Federal Sentencing Reform Act of 1984, "the Guidelines [were made] effectively advisory." *United States v. Booker*, 543 U.S. 220, 245 (2005). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing 18 U.S.C. § 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as just one among several of the sentencing factors.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United*

*States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is *not* an appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, this Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added).

## ARGUMENT

**I.    Nature and Circumstances of the offense**

In June 2016, Ms. Torres was sentenced to a term of 252 months in custody for her convictions in case 15-CR-135. While serving her sentence in BOP custody, in July 2019, and after a period of time in solitary confinement, Ms. Torres wrote a letter out of anger. She then made a decision that she would soon to regret—she sent it to A.M., the mother of the complaining witness in her 2015 case, for which she was serving time.

As she stated to the FBI agents when they interviewed her in March 2020, by the time Ms. Torres was released from solitary confinement, she was no longer angry with A.M. Nor did she have any intention of making good on the threats she made in her letter. Regardless, Ms. Torres

understands that her letter likely caused great distress to A.M., and she accepts fully responsibility for her actions.

## II.     Ms. Torres's history and characteristics

Ms. Torres was born Franklin Torres in El Salvador to Antonio Flores and Maria Torres. Ms. Torres's was raised in a small home without electricity and running water in a poor part of the country with three brothers and a sister. Though Ms. Torres was raised by a loving mother, her upbringing was ultimately dysfunctional and rife with violence and abuse, primarily perpetrated by the men and boys around her. Specifically, as Ms. Torres's brothers perceived her to be queer, their behavior toward her became physically, verbally, and emotionally violent in an attempt to get her to conform to traditional gender norms.

When Ms. Torres was about 16 years old, her brothers moved to the United States and about a decade later, Ms. Torres followed with the primary goal of sending money to her mother back home in El Salvador. Ms. Torres remained close to her mom until her mother's passing in 2017 while she was incarcerated. This had a deep impact on Ms. Torres, who was her principal source of support among her immediate family. Since her mother's passing, however, Ms. Torres has learned the importance of talk therapy and community. Within the BOP, Ms. Torres has learned from other inmates in an effort to make amends, and she has engaged in rehabilitative efforts through her therapy and programming. In addition, Ms. Torres has committed to learning skills that will allow her to participate as a productive member of society once released. For example, when Ms. Torres's began her sentence in BOP, she could not speak much English but now she is beyond proficient.

But perhaps most importantly, Ms. Torres has internalized the importance of both not acting out of anger and of accepting responsibility for her own actions. All of Ms. Torres's actions

4

since the decision she made in July 2019, from speaking truthfully to the FBI agents to quickly accepting responsibility before the Court make that clear.

**III.    The purposes of sentencing will be accomplished with the requested sentence**

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 581 U.S. 62, 67 (2017); *see also* 18 U.S.C. § 3553(a)(2).  In addition, this Court must assess "the need for the sentence imposed" "to reflect the seriousness of the offense, promote respect for the law, . . . provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)–(C).

> **A.    The requested sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment, as well as provides adequate deterrence to criminal conduct and protects the public.**

Title 18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  A lengthy term of incarceration is not required in order for a sentence to reflect the seriousness of the offense.  Even a sentence of probation "rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99). The Court should impose its sentence concurrent to the sentence Ms. Torres is already serving because doing so would be just under the § 3553(a) factors.

Ms. Torres has been in custody on the warrant in this case for over just four months, since

5

June 2025. But Ms. Torres has been under indictment in this case and in the custody of BOP for nearly four and a half years. Yet it was not until this summer that the government elected to writ her to this jurisdiction for prosecution on the indictment in this case. The Court should consider this delay and the government's behavior in determining the seriousness of the offense and what a just sentence would be.

Even a concurrent sentence is punishment by virtue of the effect it has on Ms. Torres's record. Such a sentence will still result in additional criminal history points and appear as a separate conviction on Ms. Torres's record. That Ms. Torres has accepted responsibility and elected to preserve judicial resources despite having a meritorious motion to dismiss the indictment against her on Sixth Amendment grounds should weigh in favor of imposing this sentence concurrently to the sentence she is serving. To once again emphasize, the offense conduct in this case occurred almost six years before Ms. Torres was brought to this district to face the charge against her despite being in the custody of the United States for the entire the period.

Despite the Guidelines statement that if an offense was committed "while the defendant was serving a term of imprisonment," the sentence "shall be imposed to run consecutively to the undischarged term of imprisonment," § 5G1.3(a), the Court has discretion to conclude otherwise. And for the reasons in this memorandum, the Court should do so in this case.

   **B.**   **The requested sentence will not create unwarranted sentencing disparities**

The Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are

relevant to the purposes of sentencing." U.S. Sent'g Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform 113 (2004).

As a noncitizen who will be deported at the conclusion of her sentence, Ms. Torres will face significant consequences that go beyond those of citizen defendants convicted of similar offenses. Ms. Torres will not be eligible for earned time credits or related benefits under the First Step Act. *See* 18 U.S.C. § 3632(d)(4)(E) (time credits inapplicable to "deportable prisoners"). Though she is already barred from such credits in her previous offense, earned time credits would be a valuable opportunity outside of Ms. Torres's reach in the event that the Court imposes a consecutive term of imprisonment. While earned time credits allow incarcerated defendants to earn reductions in their sentences, those reductions are tied to beneficial programming, much of which is inaccessible to noncitizens.

That Ms. Torres will face further consequences due to her immigration status should be considered by the Court in fashioning a sentence in this case. Indeed, thee D.C. Circuit in *United States v. Smith*, 27 F.3d 649, 650 (1994), held that "a sentencing court may depart below the range indicated by the Sentencing Guidelines where the defendant, solely because he is a deportable alien, faces the prospect of objectively more sever prison conditions than he would otherwise." And though *Smith* was decided before the Supreme Court's decision in *Booker*, subsequent decisions have affirmed the applicability of the principle even when "defense counsel declined to argue in support of th[e] departure because he was bound by the plea agreement not to argue for any departures, but . . . intended to argue later for a downward variance on those same grounds (a *Smith* variance)." *United States v. Thomas*, 999 F.3d 723, 733–34 (D.C. Cir. 2021). Thus, if the Court were inclined, for example, to impose a top of the guideline sentence of 16 months but

granted a *Smith* variance, the actual sentence imposed should be approximately 10 months.

What is more, the conditions inside ICE facilities have grown increasingly worse in 2025 due to overcrowding and the reduced frequency of deportations. *See, e.g.*, Jasmine Garsd, In recorded calls, reports of overcrowding and lack of food at ICE detention centers, June 6, 2025, https://www.npr.org/2025/06/05/nx-s1-5413364/concerns-over-conditions-in-u-s-immigration-detention-were-hearing-the-word-starving (last visited Sept. 25, 2025). And even ignoring a *Smith* variance, which Ms. Torres asserts would be appropriate in this case, noncitizen defendants are known to be held in U.S. Marshal custody well-beyond their release dates. *See* American Immigration Council, Immigration Detention in the United States by Agency, Aug. 20, 2025, https://www.americanimmigrationcouncil.org/fact-sheet/immigration-detention-united-states-agency/ (last visited Sept. 25, 2025) (noting that even though noncitizen defendants should be transferred to immigration custody immediately upon the conclusion of their criminal sentence, the U.S. Marshal Service has been known to hold defendants in "custody up to six weeks past their release dates").

## CONCLUSION

The requested sentence is not greater than necessary, and is sufficient for the purposes of sentencing. For these and any other reasons set forth at the sentencing hearing, Ms. Torres respectfully requests a ten-month sentence to run concurrent to the remainder of Ms. Torres's sentence in case 15-CR-135, or in the alternative, a six-month term of imprisonment to run consecutive to her previously imposed sentence.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

                                                /s/
_____
TEZIRA ABE
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500